TAYLOR v. INTERIM HEALTHCARE OF RALEIGH-DURHAM, INC.

[154 N.C. App. 349 (2002)]

LARRY TAYLOR, Administrator of the Estate of WILLIAM TAYLOR, JR., Plaintiff v. INTERIM HEALTHCARE OF RALEIGH-DURHAM, INC., Defendant

No. COA02-91

(Filed 3 December 2002)

**1. Wrongful Death— proximate cause—sufficiency of evidence—directed verdict**

The trial court erred in a wrongful death action by directing verdict in favor of defendant healthcare corporation at the close of plaintiff administrator of estate's evidence on grounds plaintiff failed to produce sufficient evidence of proximate cause between defendant's alleged breach of duty in its home nursing care of decedent after his leg surgeries and decedent's subsequent death, because the evidence sufficiently established that: (1) in the exercise of reasonable care, the nurse taking care of decedent could have foreseen her failure to inform decedent's doctors of the state of the wound on decedent's leg could result in consequences of an injurious nature; (2) the fact decedent's doctors were unaware of the open state of the wound was likely to produce the result which occurred; (3) there was a direct cause and effect relationship between the nurse's failure to act and the result; (4) the nurse's failure to act was a substantial factor in the result; and (5) there existed a continuous sequence between cause and result.

**2. Venue— motion for change denied—no abuse of discretion**

The trial court did not abuse its discretion in a wrongful death action by denying plaintiff administrator of estate's motion to change the venue to the county where plaintiff was pursuing a related medical malpractice action against decedent's doctors, because there were several valid grounds upon which the trial court could base this denial including plaintiff's failure to move for a change in venue until almost two years after the commencement of the action and after the case had already been calendared twice in the present county.

Appeal by plaintiff from order entered 24 July 2001 and order and judgment entered 17 September 2001 by Judge Narley L. Cashwell in Durham County Superior Court. Heard in the Court of Appeals 12 November 2002.

*Jones Martin Parris & Tessener Law Offices, PLLC, by Thomas E. Barwick, for plaintiff-appellant.*

*Yates, McLamb & Weyher, L.L.P., by Barbara B. Weyher and Michael C. Hurley, for defendant-appellee.*

MARTIN, Judge.

Plaintiff Larry Taylor, as administrator of the estate of William Taylor, Jr., ("decedent") appeals the entry of an order and final judgment granting the motion of defendant Interim Healthcare of Raleigh-Durham, Inc., for a directed verdict at the close of plaintiff's evidence on grounds plaintiff had failed to produce sufficient evidence of proximate cause between defendant's alleged breach of duty and decedent's subsequent death. We reverse the entry of directed verdict and remand for a new trial.

The facts pertinent to the appeal are as follows: Decedent suffered from peripheral vascular disease. At all relevant times, decedent was being treated for complications from the disease by surgeons Joseph Mulcahy and Cynthia Robinson. Throughout the mid to late 1990's, Drs. Mulcahy and Robinson performed various surgeries on the vascular structures in decedent's left leg, including a 1995 surgery to graft the femoral artery of the right leg to the femoral artery of the left leg to improve circulation in the left leg. On 11 July 1997, Drs. Mulcahy and Robinson operated on decedent's left leg to de-clot a saphenous vein graft and remove dead tissue from around the graft. The incision was closed with blue sutures, and decedent's thigh muscle was mobilized in order to cover the graft. The surgery left decedent with two large wounds on his left thigh.

Decedent was discharged from the hospital on 17 July 1997. Defendant was engaged to provide decedent with home nursing care beginning 17 July, including twice-daily dressing changes to the two wounds on decedent's left thigh. On the afternoon of 19 July, Corrine Taylor-Allen, a nurse employed by defendant, observed during a routine visit to decedent's home that decedent had an area of swelling below the knee on his left leg. Taylor-Allen contacted Dr. Mulcahy, who advised that decedent be brought to the emergency room immediately. Decedent presented to the emergency room where Dr. Mulcahy performed a final surgery on his left leg wherein the bridge of skin between the existing wounds was cut, leaving only one wound. Dr. Mulcahy discharged decedent from the hospital that evening.

On the morning of 20 July, Taylor-Allen again visited decedent's home. She noted the two prior wounds were now one larger wound, and that there appeared to be a large amount of drainage in the wound. Taylor-Allen also noted that she saw what she believed to be a tendon visible in the wound bed. Taylor-Allen did not contact Drs. Mulcahy or Robinson to report the drainage or visible tendon. Taylor-Allen returned to decedent's home late in the afternoon of 20 July. She recorded that what she had believed to be a tendon that morning was actually the femoral artery, and that the blue sutures used to close decedent's saphenous vein graft following surgery were now visible. Taylor-Allen did not contact her supervisors or decedent's doctors about the visible femoral artery and sutures, nor did she alert decedent that he should go to the hospital or contact his doctors.

In the early morning of 21 July 1997, decedent awoke his sons to alert them that he needed to be transported to the emergency room. Decedent's sons observed "squirts of blood" coming from decedent's left leg, decedent's bed sheets were completely soaked with blood, and there was a pool of blood one inch deep beside decedent's bed. Decedent's son Ricky testified that when he came to his father's aid, decedent stated twice that "[t]he nurse said it might burst." Decedent arrived via ambulance at the hospital shortly after 2:00 a.m. and died minutes thereafter. The cause of death was determined to be a hemorrhage due to a breakdown of the wound from the vascular surgery. Dr. Mulcahy examined decedent's leg wound postmortem and observed that parts of the saphenous vein graft were visible and exposed in the wound bed.

On 3 May 1999, plaintiff initiated this action for wrongful death, alleging defendant was negligent in failing to render care to decedent consistent with the applicable standard of practice and that such negligence resulted in the rupture of decedent's femoral bypass, causing him to bleed to death. On 19 March 2001, plaintiff moved to change the venue to Vance County, where plaintiff had initiated a related medical malpractice action against decedent's doctors; plaintiff's motion was denied.

At trial, plaintiff presented the testimony of Dr. Bruce Morgan, an expert in general and vascular surgery. Dr. Morgan testified that had Taylor-Allen alerted decedent's treating physician to the fact his femoral artery was visible in the wound bed, any reasonable physician would have immediately admitted decedent to the hospital and performed a ligation, wherein the graft would be tied off. Dr. Morgan testified that had a ligation been performed on decedent's graft, dece-

dent would not have experienced a hemorrhage since the graft was the only source of blood to decedent's left leg. Dr. Mulcahy testified that if he had known the femoral artery was visible in the wound bed, he would have admitted decedent to the hospital and ligated the graft due to the "great risk" of the wound opening up and bleeding. Dr. Robinson testified that had she been alerted to the fact a nurse believed decedent's femoral artery was visible in the wound bed, she would have requested decedent be brought to the hospital immediately for evaluation.

Dr. Mulcahy testified that, in his opinion, decedent most likely died of a hemorrhage to the saphenous vein graft. He further testified that during his postmortem examination of decedent's wound, he observed what he thought was a possible tear in decedent's graft. However, Dr. Mulcahy was not certain that the hemorrhage occurred where he believed he saw a tear, or whether it occurred at a location on the saphenous vein graft that was visible in the wound bed, or elsewhere on the graft.

Additionally, plaintiff presented evidence from an expert in the field of nursing, who testified a visible or exposed artery in a wound bed constitutes a "medical emergency," and Taylor-Allen's failure to alert decedent's doctors to the state of the femoral artery and sutures on 20 July, among other of her actions, fell below the reasonable standard of care for the profession. Taylor-Allen testified she knew decedent's wound was a "high risk" wound due to the lack of structures surrounding the femoral artery, and that, depending on decedent's activity level, the artery could possibly rupture.

At the close of plaintiff's evidence, defendant moved for a directed verdict. During arguments on the motion, the trial court stated that for purposes of the motion, it would assume Taylor-Allen had violated every conceivable standard of care in failing to alert decedent's doctors to the state of the wound, but that because plaintiff had not presented evidence that decedent's hemorrhage occurred on a portion of the saphenous vein graft actually visible to Taylor-Allen, plaintiff had failed to show the necessary connection between Taylor-Allen's breach of duty and decedent's subsequent hemorrhage. Accordingly, the trial court granted defendant's motion on grounds that "Plaintiff's evidence as to proximate cause of death is insufficient as a matter of law and that Defendant is entitled to judgment on the merits of this action." Plaintiff appeals.

TAYLOR v. INTERIM HEALTHCARE OF RALEIGH-DURHAM, INC.

[154 N.C. App. 349 (2002)]

Plaintiff brings forward three arguments on appeal: (1) the trial court erred in granting defendant's motion for directed verdict because plaintiff presented sufficient evidence of proximate cause; (2) the trial court abused its discretion in denying plaintiff's motion to change venue; and (3) the trial court erred in excluding testimony from plaintiff's expert in nursing that Taylor-Allen's recopying of decedent's medical chart following his death was a violation of the applicable standard of care.

**[1]** We first address the trial court's grant of directed verdict on the issue of proximate cause.

> The law with regard to directed verdicts is clear. In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor. . . . [W]here the question of granting a directed verdict is a close one, we have said that the better practice is for the trial court to reserve its decision on the motion and allow the case to be submitted to the jury.

*Turner v. Duke University*, 325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989). "To prevail on a claim of negligence, the plaintiff must establish that the defendant owed him a duty of reasonable care, 'that [the defendant] was negligent in his care of [the plaintiff,] and that such negligence was the proximate cause of [the plaintiff's] injuries and damage.' " *Williamson v. Liptzin*, 141 N.C. App. 1, 10, 539 S.E.2d 313, 319 (2000) (citation omitted), *review dismissed and disc. review denied*, 353 N.C. 456, 548 S.E.2d 734 (2001). Moreover, because causation is an inference of fact to be drawn from the circumstances, "proximate cause is normally a question best answered by the jury." *Leatherwood v. Ehlinger*, 151 N.C. App. 15, 24, 564 S.E.2d 883, 889 (2002).

We first disagree with defendant's contention that plaintiff was unable to sufficiently establish decedent's cause of death. Contrary to defendant's assertion that Dr. Mulcahy was unable to conclude anything other than decedent bled to death from an unknown location, Dr. Mulcahy opined decedent most likely died as a result of a hemorrhage to the saphenous vein graft. He testified that although he could not be certain the exact location of the hemorrhage on the saphenous

vein graft, it was indeed his opinion, based on his training as a vascular surgeon and familiarity with decedent's condition and leg, the most likely cause of death was a hemorrhage of that graft. This testimony sufficiently established decedent's cause of death for purposes of withstanding a motion for directed verdict. *See Felts v. Liberty Emergency Service, P.A.*, 97 N.C. App. 381, 389, 388 S.E.2d 619, 623 (1990) (physician's statement that it was "possible" a heart attack could have been prevented had plaintiff been admitted to hospital, combined with testimony as to what could have been done at hospital to prevent severity of attack sufficient evidence of proximate cause to withstand motion for directed verdict); *Largent v. Acuff*, 69 N.C. App. 439, 443, 317 S.E.2d 111, 113 (holding testimony from doctor that lack of early surgery "quite likely" contributed to patient's paralysis sufficiently concrete to survive motion to dismiss, and noting term "quite likely" denotes much higher probability than "may"), *disc. review denied*, 312 N.C. 83, 321 S.E.2d 896 (1984).

We also disagree with defendant's assertion that plaintiff failed to provide the necessary causative link between any breach of duty by Taylor-Allen in her care of decedent and decedent's death from a hemorrhage to the saphenous vein graft. Defendant argues, and the trial court determined, that in order for plaintiff to establish proximate cause between Taylor-Allen's failure to report the state of the wound and the hemorrhage, plaintiff would be required to present evidence showing the hemorrhage occurred on the exact portion of the graft visible to Taylor-Allen. Such an interpretation of proximate cause is too narrow.

> North Carolina appellate courts define proximate cause as a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Williamson*, 141 N.C. App. at 10, 539 S.E.2d at 319. Foreseeability is a necessary element of proximate cause. *Id.* "To prove that an action is foreseeable, a plaintiff is required to prove that 'in "the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." ' " *Id.* (citations omitted). The plaintiff need not prove the defendant foresaw the exact injury which occurred. *Id.* In addition to foreseeability, other

factors to consider in assessing proximate cause are whether the cause was likely to produce the result, whether the relationship of cause and effect is too attenuated, the existence of intervening causes, whether the cause was a substantial factor in the result, and whether there existed a continuous sequence between cause and result. *Id.* at 11, 539 S.E.2d at 319-20.

In the present case, defendant argues plaintiff's lack of evidence that the hemorrhage occurred at a place visible to Taylor-Allen renders any link between her alleged breach of duty and the subsequent hemorrhage one of coincidence and sequence as opposed to consequence; in other words, defendant maintains Taylor-Allen's failure to alert decedent's doctors to the state of the wound cannot have been the cause of the subsequent hemorrhage if Taylor-Allen could not see the exact location where the hemorrhage occurred, and the fact decedent subsequently suffered a hemorrhage possibly at some other location in the leg was simply coincidental and temporal.

Defendant's argument does not stand in the face of the medical testimony tending to show that the state of the wound and the visible nature of the femoral artery was, in and of itself, an indication of the breakdown in the structures of decedent's femoral bypass specifically placing decedent at risk of hemorrhage in those structures. Plaintiff's nursing expert testified that a visible or exposed artery in a wound bed constitutes a "medical emergency." Dr. Mulcahy testified that a visible femoral artery in the wound bed would signify the muscle had uncovered the graft and the graft would not be working as it should, thereby placing the patient "at a great risk" of the graft opening up and bleeding. Indeed, the fact that the state of the wound itself was indicative of the risk of hemorrhage was demonstrated by the testimony of the physicians that if they had known the femoral artery was visible in the wound bed, they would have requested decedent come to the hospital immediately for evaluation, and that based simply on the knowledge the femoral artery was visible, a ligation would be necessary in order to prevent hemorrhaging.

Moreover, the evidence established, by more than a mere scintilla, that it was specifically foreseeable to Taylor-Allen that the state of decedent's wound and the lack of other structures surrounding and protecting the femoral artery placed decedent at a risk of hemorrhage. Decedent expressed to his son that the nurse specifically informed him the wound "might burst," and Taylor-Allen testified herself that the state of the wound was "high risk" and could be susceptible to rupture. Thus, regardless of where the hemorrhage in dece-

dent's graft actually occurred and whether it occurred at a location visible to Taylor-Allen, the testimony provides more than a scintilla of evidence establishing that it was, or at least should have been, foreseeable to Taylor-Allen based on her observation of the open state of the wound and femoral artery, that decedent was at risk of experiencing a breakdown of his femoral bypass, and consequently, his doctors should have been informed of the state of the wound. As our Supreme Court has observed, evidence of such a failure to act in the face of such foreseeability is "the essence of proximate cause." *Turner*, 325 N.C. at 160, 381 S.E.2d at 711.

Additionally, the evidence also sufficiently established that had Taylor-Allen informed decedent's doctors of her observations, the hemorrhage which killed decedent would not have occurred. Dr. Morgan's expert testimony established that had Taylor-Allen properly informed decedent's doctors of the state of the wound, any reasonable doctor would have immediately performed a ligation to tie off the graft to prevent hemorrhaging. He further testified that had that been done in this case, decedent would not have suffered the hemorrhage which killed him. The testimony of Drs. Mulcahy and Robinson, that had they known of the state of the wound they would have requested that decedent come to the hospital and that Dr. Mulcahy would have performed a ligation, supported Dr. Morgan's testimony. Such testimony constitutes more than a mere scintilla of evidence that had Taylor-Allen alerted decedent's doctors to the fact the femoral artery was visible in the wound bed, as the standard of care required, decedent would have been admitted to the hospital and a ligation performed that would have prevented the hemorrhage that caused his death.

In summary, plaintiff's evidence, taken in the light most favorable to plaintiff, giving him the benefit of all reasonable inferences, sufficiently established that in the exercise of reasonable care, Taylor-Allen could have foreseen her failure to inform decedent's doctors of the state of the wound could result in consequences of an injurious nature; that the fact decedent's doctors were unaware of the open state of the wound was likely to produce the result which occurred; that there was a direct cause and effect relationship between Taylor-Allen's failure to act and the result; that Taylor-Allen's failure to act was a substantial factor in the result; and that there existed a continuous sequence between cause and result. Such evidence is all plaintiff was required to forecast on the issue of proximate cause in order to overcome the motion for directed verdict. *See Williamson*, 141

N.C. App. at 11, 539 S.E.2d at 319-20. The trial court erred in granting a directed verdict in favor of defendant on this issue. Accordingly, plaintiff is entitled to a new trial.

[2] In his second argument, plaintiff maintains the trial court abused its discretion in denying his motion to change the venue to Vance County where he was pursuing a related medical malpractice action against decedent's doctors. A trial court's ruling on a motion to change venue will not be disturbed on appeal absent a manifest abuse of discretion. *Smith v. Mariner*, 77 N.C. App. 589, 335 S.E.2d 530 (1985), *disc. review denied*, 315 N.C. 590, 341 S.E.2d 29 (1986). We discern from the record no abuse of discretion in the trial court's denial of plaintiff's motion, as there appear in the record several valid bases upon which the trial court could base that denial, including, among other things, plaintiff's failure to move for a change in venue until almost two years after the commencement of the action and after the case had already been calendared twice in Durham County. This assignment of error is overruled.

In light of our holding, we need not address plaintiff's final assignment of error directed to the exclusion of certain testimony offered through his expert witness in the field of nursing. The entry of a directed verdict in favor of defendant is reversed, and this case is remanded for a new trial.

Reversed and remanded.

Chief Judge EAGLES and Judge GREENE concur.